**ONEIDA INDIAN NATION OF NEW YORK, et al., Plaintiffs-Appellants, Cross-Appellees,**

v.

**STATE OF NEW YORK, Counties of Broome, Chenango, Cortland, Herkimer, Jefferson, Lewis, Madison, Oswego, Oneida, Onondaga, St. Lawrence and Tioga, Individually and as Class Representatives, Defendants-Appellees, Cross-Appellants.**

**ONEIDA INDIAN NATION OF WISCONSIN and Oneida of the Thames Band, Plaintiffs-Appellants, Cross-Appellees,**

v.

**STATE OF NEW YORK, Counties of Broome, Chenango, Cortland, Herkimer, Jefferson, Lewis, Madison, Oneida, Onondaga, Oswego, St. Lawrence and Tioga, New York, and Valentine Ryan, New York Electric & Gas Corp., St. Regis Paper Co., and Georgia Pacific Corp., Individually and as Class Representatives, Defendants-Appellees, Cross-Appellants.**

Nos. 683, 710 and 815 to 818, Dockets 81–7616, 81–7618, 81–7626, 81–7628, 81–7638 and 81–7646.

United States Court of Appeals, Second Circuit.

Argued April 28, 1982.

Decided Oct. 4, 1982.

Arlinda Locklear, Washington, D.C. (Lawrence Aschenbrenner, Native American Rights Fund, Washington, D.C., Francis Skenandore, Oneida, Wis., Norman Dorsen, New York City, of counsel), for Oneida Indian Nation of Wisconsin and Oneida of the Thames Band.

Bertram E. Hirsch, Floral Park, N.Y., for Oneida Indian Nation of New York.

Jeremiah Jochnowitz, Asst. Sol. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen., State of N.Y., Shirley Adelson Siegel, Sol. Gen., Franklin K. Breselor, Asst. Atty. Gen., Albany, N.Y., of counsel), for State of N.Y.

Allan van Gestel, Boston, Mass. (Jeffrey C. Bates, Goodwin, Procter & Hoar, Boston, Mass., of counsel), for the 12 New York Counties and Valentine Ryan, Individually and as Class Representatives.

Howard M. Schmertz, New York City (Huber, Magill, Lawrence & Farrell, New York City, of counsel), for New York State Electric & Gas Corp.

Richard D. Davidson, Syracuse, N.Y. (Hiscock, Lee, Rogers, Henley & Barclay, Syracuse, N.Y., of counsel), for St. Regis Paper Co. and Georgia Pacific Corp., Individually and as Class Representatives.

Robert T. Coulter, Washington, D.C. (Curtis G. Berkey, Indian Law Resource Center, Washington, D.C., of counsel), for amicus curiae The Houdenosaunee.

Before MANSFIELD and KEARSE, Circuit Judges, CABRANES,\*\*\* District Judge.

MANSFIELD, Circuit Judge:

For the first time in Indian land claim litigation a federal court is asked to invalidate land purchases made by a state from Indian tribes prior to the adoption of the United States Constitution, allegedly in violation of the Articles of Confederation. The plaintiffs in this consolidated action are the direct successors in interest to the Oneida Indian Nation ("Oneida"), whose members since time immemorial had prior to the American Revolution occupied land in central New York State totalling approximately six million acres. They seek to invalidate two "state" treaties between New York and the Oneidas concluded in 1785 (Fort Herkimer Treaty) and 1788 (Fort Schuyler Treaty) which purported to transfer over five million acres of Oneida land to New York State.[1] The district court, Neal P. McCurn, *Judge,* dismissed the action for failure to state a claim upon which relief may be granted. We affirm in part, reverse in part, and remand for additional proceedings in order fully to develop the complex factual and legal issues underlying certain claims raised by the Oneidas.

---

\* Of the United States District Court for the District of Connecticut, sitting by designation.

\*\* Judge Cabranes having requested that he be relieved of any consideration of this appeal, this decision is rendered solely by Judges Mansfield and Kearse, who are in agreement, pursuant to the Rules of this Court, § 0.14(b).

1. The Oneidas' claims concern a swath of land 50 to 60 miles in width extending from the Pennsylvania border to the Canadian border and encompassing portions of 13 New York counties.

The Oneidas raise two broad claims. First, they contend that their aboriginal title to their land, confirmed and guaranteed by federal treaties and pronouncements pursuant to powers delegated to the federal government under the Articles of Confederation, was never extinguished since the state treaties were improperly concluded without federal consent. Therefore, they claim, the state treaties are void and the Oneidas' original right of occupancy is intact. Alternatively, they maintain that even if valid the state treaties, either by their terms or by virtue of New York's fraudulent conduct during their negotiation, reserved to the Oneidas an interest in the subject lands which subsequently came under the protection of the Nonintercourse Act, 25 U.S.C. § 177,[2] enacted in 1790 pursuant to Congress' authority under Article I, § 8, clause 3 of the newly adopted Constitution of the United States.[3] They contend that their subsequent dispossession of the land occurred improperly without federal consent, and therefore their aboriginal title was never validly extinguished. For relief, they seek, *inter alia,* recovery of the subject land, fair rental value for the entire period of dispossession, damages for fraudulent misrepresentation, and a declaration of hunting and fishing rights.

In an exhaustive opinion published at 520 F.Supp. 1278 (N.D.N.Y.1981), Judge McCurn found that there was jurisdiction under 28 U.S.C. §§ 1331 and 1362, and held that the claims were not barred by either the nonjusticiability doctrine or by the Eleventh Amendment. He dismissed the suit, however, for failure to state a claim upon which relief might be granted, F.R. Civ.P. 12(b)(6), holding that internal inconsistencies and ambiguities within the Articles of Confederation, specifically Article IX, clause 4, preclude their being construed as delegating to the federal government the exclusive authority to extinguish aboriginal title to land within a state's borders and that federal consent therefore was not required to validate the New York treaties. He also rejected the alternative claims that the New York treaties reserved to the Oneidas an interest in the land that was subsequently extinguished in violation of the Nonintercourse Act.

## BACKGROUND

In reviewing the background and history underlying these claims for purposes of determining whether the dismissal must be upheld, we accept as true all material factual allegations and construe the complaint in favor of the complaining party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). At the outset a brief explication of the legal concepts that govern title in Indian land is necessary to understand the nature of the claims and to place in proper perspective the contested historical facts advanced by the parties.

The rights of American Indians to the land they inhabited since time immemorial are governed by the doctrine of "discovery" and related legal principles first elaborated in a series of decisions by the Marshall Court. *Mitchel v. United States,* 34 U.S. (9 Pet.) 711, 9 L.Ed. 283 (1835); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823); *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810). Accord, *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974). The Supreme

---

**2.** The Nonintercourse Act essentially requires federal consent for all land purchases from Indian nations and tribes. Congress enacted the first Nonintercourse Act in 1790. Act of July 22, 1790, ch. 33, 1 Stat. 137. Section 4 of the Act provided in part that:

"... no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person, persons, or to any state, whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States."

The Act has been amended several times and presently is codified at 25 U.S.C. § 177.

**3.** "Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes."

Court recently summarized these principles in *Oneida Indian Nation, supra,* 414 U.S. at 667, 94 S.Ct. at 777:

> "although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act."

 This right of occupancy which the Indians retain until validly extinguished has been variously termed "aboriginal title, unrecognized title, original Indian title, or simply Indian title." Clinton & Hotopp, "Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims," 31 Me.L.Rev. 17, 20 (1979). It must be distinguished from the concept of *fee title* of the discoverer. The two types of interest—*fee title* of the discoverer and *Indian title* of the native inhabitants—relate to different concerns. The discovery doctrine, which vests fee title in the discovering sovereign, was designed to regulate the competing claims of European nations to the right to purchase Indian land: the discovering nation vested with fee title is given the exclusive right against all others to acquire the right to occupancy to a particular parcel of land from the inhabiting Indians. See Berman, "The Concept of Aboriginal Rights in the Early Legal History of the United States," 27 Buffalo L.Rev. 637, 655 (1978). Thus the concept of fee title in the context of Indian lands does not amount to absolute ownership, but rather is used interchangeably with "right of preemption," or the preemptive right over all others to purchase the Indian title or right of occupancy from the inhabitants. *Oneida Indian Nation, supra,* 414 U.S. at 670, 94 S.Ct. at 778.

 The discovery doctrine, however, does not determine the relationship between the holder of the fee title and the inhabiting Indians, since the mere possession of the fee title does not thereby entitle the holder to any possessory interest in the land vis-a-vis the Indians. Rather, possession is governed by the concept of Indian title, which recognizes the Indians as "the rightful occupants of the soil, with a legal as well as just claim to retain possession." *Johnson v. McIntosh, supra,* 21 U.S. (8 Wheat.) at 574. Until Indian title is extinguished by sovereign act, any holder of the fee title or right of preemption, either through discovery or a grant from or succession to the discovering sovereign, remains "subject ... to the Indian right of occupancy," *id.,* and the Indians may not be ejected. See, e.g., *Clark v. Smith,* 38 U.S. (13 Pet.) 195, 201, 10 L.Ed. 123 (1839); *Beecher v. Wetherby,* 95 U.S. 517, 525, 24 L.Ed. 440 (1877); *Fletcher v. Peck, supra,* 10 U.S. (6 Cranch) at 142–43; see also Newton, "At the Whim of the Sovereign: Aboriginal Title Reconsidered," 31 Hast.L.J. 1215, 1221 (1980). As the Court stated in *Worcester v. Georgia, supra,* 31 U.S. (6 Pet.) at 546, the fee title "asserted a title against Europeans only, and [was] considered as blank paper, so far as the rights of the natives were concerned." Thus discovery gave the sovereign only an "ultimate reversion in fee," *Mitchel v. United States, supra,* 34 U.S. (9 Pet.) at 756, subject to the tribe's "perpetual right of possession ... considered as sacred as the fee-simple of the whites," *id.* at 745–46. Relative to the possessory rights of inhabiting Indians, therefore, the fee title represents merely a "perfectable entitlement," Henderson, "Unraveling the Riddle of Aboriginal Title," 5 Am. Indian L.J. 75, 90–91 (1977) (quoted in Berman, *supra,* 27 Buff.L.Rev. 637, 645), that remains encumbered by Indian title unless and until the latter is extinguished by sovereign act. Only then is the fee title freed of Indian rights of occupancy by virtue of aboriginal title. *Johnson v. McIntosh, supra,* 21 U.S. (8 Wheat.) at 588; see also *id.* at 573–74.

Prior to the American Revolution Great Britain as the discovering sovereign held exclusively both the right of preemption and the power to extinguish Indian title by

conquest or such agreements as might be made with the aboriginal Indians. The Crown, having conveyed the fee title to land to the colonists by various charters and patents, initially permitted the colonists to purchase and extinguish Indian title, either individually or through the colonies. Many of the colonies, in order to minimize disputes with the Indians, enacted laws requiring colonial approval for individually negotiated land cessions. Unauthorized and unrestricted encroachments on Indian lands continued, however, and the Crown recognized the need to devise plans for a comprehensive and uniform Indian policy. In 1754, for example, the Lords of Trade in England prepared a Plan for General Consent of the colonies which provided that "the sole direction of Indian affairs be placed in the hands of some single person." Clinton & Hotopp, *supra,* 31 Me.L.Rev. at 21 (quoting VI Documents Relative to the Colonial History of the State of New York 903–95 (E. B. O'Callaghan ed. 1855)). The efforts of the Crown culminated in the issuance of the Royal Proclamation of 1763,[4] which forbade the purchase or settlement of Indian lands by anyone, including the colonial governors, without permission of the Crown. See Clinton & Hotopp, *supra,* 31 Me.L.Rev. at 22.

The perceived need for a national Indian policy was shared by the colonists, resulting in the creation of certain federal administrative mechanisms even prior to the adoption of the Articles of Confederation. Initially in 1774, for instance, Benjamin Franklin drafted a plan at the Albany Conference for a union of the colonies and for the exclusive regulation of Indian affairs by a "President General." *Id.* at 21. Subsequently in 1775 the Continental Congress during the Revolutionary War created a Department of Indian Affairs to secure the friendship of the tribes and to counter British-inspired hostilities. By the Resolution of July 12, 1775, the Continental Congress

established three departments to manage Indian affairs and manage peaceful relations. II *Journals of the Continental Congress* 174–77 (Library of Cong. ed.). Each department was "to treat with the Indians ... in order to preserve peace and friendship with the said Indians, and to prevent their taking any part in the present commotions." *Id.* at 175. In establishing these departments, the Continental Congress was "exercising definite governmental power for all the colonies [and] declared its jurisdiction over Indian tribes." F. Cohen, Handbook of Federal Indian Law 9 (1942).

Rather than create an entirely new policy, the Continental Congress continued the basic approach of the British Proclamation of 1763, which was to focus concern on those Indian tribes located in what was known as "Indian Country," i.e., those Indian lands lying west of the boundary line of the 1763 Proclamation separating the lands of the Indian tribes from colonial settlements. The subject lands of this action are located in this "Indian Country." Paterson & Roseman, "A Reexamination of *Passamaquoddy v. Morton,*" 31 Me.L.Rev. 115, 126–27, 150 n.153 (1979). Two years later in 1777 the Continental Congress established an Eastern Indian Agency having jurisdiction over "the Indians in Nova Scotia and the Tribes to the Northward and Eastward thereof." *Id.* at 127 (citing 7 *Jour. of the Cont. Cong.* 34 (1777)).

These federal mechanisms were continued under the Articles of Confederation, which were approved in 1777 and became effective in 1781. Article IX, clause 1, granted Congress the "sole and exclusive right and power of determining on peace and war ... [and] entering into treaties and alliances...." All powers not "expressly delegated" are retained by each State. Art. II. Article IX, clause 4, specifically referring to Indian affairs, provided that:

---

**4.** 1 Laws U.S. 443–48. The Proclamation is reprinted in H. Commager, *Documents of American History* 47–50 (1934). The policy of the Royal Proclamation was to delineate an "Indian country" within which trading could

only be conducted with the approval of the Crown, and to establish that all grants of land from the Indians would be valid only with the approval of the sovereign.

"The United States in Congress assembled shall also have the sole and exclusive right and power of . . . [r]egulating the trade and managing all affairs with the Indians, not members of any of the States, provided that the legislative right of any State within its own limits be not infringed or violated."

In carrying out its Article IX responsibilities the Congress of the Confederation created an administrative framework that "followed the colonial precedent." Cohen, *supra,* at 9. The Congress had charged a committee to draft a document "for the complete arrangement and government of the Indian Department." 30 *Jour. of the Cont. Cong.* 332 (1786) (cited in Paterson & Roseman, *supra,* 31 Me.L.Rev. at 128). The result was the 1786 Ordinance for the Regulation of Indian Affairs, 31 *Jour. of the Cont. Cong.* 491 (cited in Cohen, *supra,* at 9 n.7), which established two departments—northern and southern—the northern of which encompassed the subject lands claimed by the Oneidas. The superintendent of each department had power to grant licenses to trade and live with the Indians and was duty bound to execute "such regulations, as Congress shall, from time to time, establish respecting Indian Affairs." 31 *Jour. of the Cont. Cong.* 491.

Two such Congressional enactments are central to this case. One, the Proclamation of September 22, 1783, affirmed the principal policy of the Royal Proclamation of 1763 by requiring federal consent for all purchases to which the 1783 Proclamation applied. See *Mohegan Tribe v. Connecticut,* 638 F.2d 612, 616 (2d Cir.), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981). The 1783 Proclamation recited the Congress' power under Article IX clause 4, stressed the needs to remove and prevent "all cause of quarrel or complaint between [the Indians] and the United States," and declared that:

"[T]he United States in Congress assembled . . . do hereby prohibit and forbid all persons from making settlements on lands inhabited or claimed by Indians, without the limits or jurisdiction of any particular State, and from purchasing or receiving any gift or cession of such lands or claims without the express authority and directions of the United States in Congress assembled.

"And it is moreover declared, that every such purchase or settlement, gift or cession, not having the authority aforesaid, is null and void, and that no right or title will accrue in consequence of any such purchase, gift, cession, or settlement," 25 *Jour. of the Cont. Cong.* 602 (1783), quoted in Clinton & Hotopp, *supra,* 31 Me.L.Rev. at 25–26.

The 1783 Proclamation represented an effort by Congress to clarify the authority of the federal government vis-a-vis the states and to avoid a costly Indian war. Clinton & Hotopp, *supra,* 31 Me.L.Rev. at 25.

The other enactment was the Treaty of Fort Stanwix, 7 Stat. 15, concluded in October 1784 between the federal commissioners and the Six Nation Iroquois Indian Confederacy ("Six Nations"), which consisted of the Seneca, Cayuga, Onondaga, Oneida, Mohawk, and Tuscarora tribes. Of these, the Oneida and Tuscarora tribes had sided with the states in the American Revolution; the remaining four were hostile tribes who had sided with the British. The central government attached considerable importance to the need for a federal treaty with the Six Nations, since it feared that any attempted expulsion of the Indians would produce a prolonged and costly war. Cohen, *supra,* at 418. New York State, however, considering itself to have authority over Indians located on their own tribal lands within the borders of New York, "stopped at nothing," *id.,* to obstruct the federal efforts, including arresting federal agents negotiating the treaties. *Id.* The Fort Stanwix treaty made special provisions in Article II for the two friendly tribes, stating:

"The Oneida and Tuscarora Nations shall be secured in the possession of the lands on which they are settled." 7 Stat. 15.

This was pursuant to Congress' instructions to the commissioners negotiating the treaty, to

"reassure the said tribes of the friendship of the United States and that they may rely that the lands which they claim as their inheritance will be reserved for their sole use and benefit until they may think it for their own advantage to dispose of the same." 25 *Jour. of the Cont. Cong.* 687.[5]

Subsequently, New York State entered into the 1785 and 1788 "state" treaties with the Oneidas, purportedly purchasing Indian title to over 5½ million acres of their aboriginal land. The details of the allegations concerning the conduct of New York's officials during the negotiations are set forth in full at 520 F.Supp. at 1287–88 and *Oneida Indian Nation v. United States,* 37 Ind.Cl. Com. 522 (1976), *aff'd,* 576 F.2d 870 (Ct.Cl. 1978), and need only be summarized briefly. In essence, plaintiffs allege that the negotiations were conducted in an atmosphere of deceit, threats and coercion. In particular, the 1785 treaty involving approximately 300,000 acres was concluded only after then-Governor Clinton had threatened to withhold state protection against trespasses on Indian lands if the Oneidas persisted in refusing an outright sale of their land. In negotiating the 1788 treaty involving nearly 5 million acres state officials induced the Oneidas to negotiate by suggesting that certain leases which the Oneidas had granted to a private speculator could jeopardize all their lands as well as their friendship with New York State, without informing the Oneidas that the State had earlier declared those private leases to be void. Governor Clinton apparently gave repeated assurances that New York's aim was only to protect the Indian land and not to purchase it, and the Oneidas believed that the treaty

restored their lands to them and only leased or entrusted certain portions to the State for their own protection. See generally *United States v. Oneida Nation of New York,* 576 F.2d 870, 874–75 (Ct.Cl.1978) (summarizing findings of Indian Claims Commission that New York treated the Oneidas unfairly and that they therefore did not voluntarily sell their lands at that time). Under the 1788 state treaty, New York was obligated to pay the Oneidas a yearly rent. The Oneidas claim that the rent was to be increased as the lands became gradually settled. These rent increases did not occur and in 1839 the payments were terminated altogether by a state statute capitalizing future payments and extinguishing the obligation through a lump sum payment. Both New York "treaties" were concluded without federal government consent or even participation.

The Oneidas claim first that the New York State treaties failed to extinguish their right of occupancy since they were concluded without the required federal consent. They read both the Proclamation of 1783 and the Treaty of Fort Stanwix as requiring such consent, and further contend that Congress had the authority under Article IX of the Articles of Confederation to require such consent both because clause 1 of that Article separately empowered the federal government to protect Indian lands as part of its war and peace and treaty-making powers and because clause 4 delegated to the federal government the exclusive right to extinguish Indian title. Second, they claim that the 1788 state treaty violated Article I, § 10, clause 1, of the U.S. Constitution prohibiting states from

---

**5.** The Treaty of Fort Stanwix was not the only treaty entered into during the confederacy by the federal government with Indian nations in the exercise of its authority under the Articles of Confederation to make peace and handle affairs with the Indian tribes. In addition it entered into the Treaty with the Wyandots and Others, 7 Stat. 16 (1785), the Treaty with the Shawnee, 7 Stat. 26 (1786), the Hopewell Treaty with the Cherokee, 7 Stat. 18 (1785), the Treaty with the Choctaw, 7 Stat. 21 (1786), and the Treaty with the Chickasaw, 7 Stat. 24 (1786). See F. Prucha, *American Indian Policy*

*in the Formative Years: The Indian Trade and Intercourse Acts, 1790–1834* (1962). Moreover, prior to the adoption of the Articles in 1781 the Congress had entered into the Treaty of 1778 with the Delaware Nation, 7 Stat. 13 (1778), under which an alliance was formed whereby the Delaware Nation granted free passage through their lands and agreed to supply soldiers for the Continental Army in return for which the Confederacy guaranteed the territorial rights of the Delaware Nation and promised to abide by the existing British treaties with the Indians.

"enter[ing] into any Treaty," and Article I, § 8, clause 3 and Article II, § 2, granting the Congress and the President, respectively, the exclusive authority to regulate commerce and enter into treaties with the Indians. This claim is premised on the Oneidas' contention that the Constitution went into effect upon its ratification by the ninth state on June 21, 1788, which pre-dated the conclusion of the 1788 treaty.

Third, they claim that even assuming that the New York treaties did not violate pre-Constitution federal law, the treaties reserved to them an interest in the land that subsequently came under the protection of the Nonintercourse Act upon its enactment in 1790, and that the subsequent dispossession of them from the land without federal consent violated the Act. They claim they retained an interest in the land because New York's fraudulent and deceitful conduct gives rise to a constructive trust on their behalf, or because the 1788 treaty constituted an express or implied trust or a perpetual lease. Fourth, they claim that the state is liable for fraudulent misrepresentation and for violating its trust obligations under Article 37 of the New York Constitution. Fifth, they claim that the 1788 treaty is fatally vague since it fails to specify the rate at which the increases in the rent would occur.

The court below found that it had jurisdiction under both 28 U.S.C. §§ 1331 and 1362. It then rejected the defendants' contention that the suit was barred by the non-justiciability doctrine and that the claims against the state defendants were barred by the Eleventh Amendment. The court, however, granted the defendants' motion pursuant to F.R.Civ.P. 12(b)(6), to dismiss for failure to state a claim. While we agree with the district court's disposition of some of the issues,[6] we reverse and remand for further proceedings to provide the parties an opportunity to introduce relevant evidence concerning the complex legal and factual issues raised in this action, in particular the division of federal and state authority over Indian affairs under the Articles of Confederation and the Oneidas' understanding of the various treaties and documents involved.

## DISCUSSION

*Defenses Based on Eleventh Amendment, Non-Justiciability, and Time Bar*

We first address the defendant's contention that the Oneidas' claims are barred by the Eleventh Amendment and the non-justiciability doctrine, and that they are time-barred by the nearly 200 years that have elapsed since the conclusion of the New York treaties. In sum, we conclude that these defenses cannot stand.

### (1) *Eleventh Amendment*

We affirm, substantially for the reasons stated below, the district court's holding that the claims against the state defendants are not barred by the Eleventh Amendment. When the states granted to Congress the power "[t]o regulate commerce ... with the Indian tribes," U.S. Constitution, Art. I, § 8, cl. 3, they necessarily "surrendered a portion of their sovereignty," *Parden v. Terminal Railway,* 377 U.S. 184, 191, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964), and thereby granted Congress the power to abrogate the states' immunity from suits upon claims arising out of such

---

**6.** As discussed below, we agree with the district court's holding that the suit is not barred as non-justiciable and that the claims against the state defendants are not barred by the Eleventh Amendment. On the merits, we also affirm, substantially for the reasons stated by the district court, the dismissal of the Oneidas' claim that the 1788 treaty post-dated and thus violated the U. S. Constitution, since under *Owings v. Speed,* 18 U.S. (5 Wheat.) 420, 5 L.Ed. 124 (1820), it is settled that the new government under the Constitution did not come into being until March 1789, well after the 1788 treaty had been concluded. We also affirm the dismissal of the claim that the 1788 treaty was fatally vague in failing to specify the rate of increase in the periodic rent, since the treaty by its terms does not provide for any such increases.

As the district court did not reach the issue with respect to defendants' indispensable party and state law defenses, 520 F.Supp. at 1290 n.9, we also do not reach them here.

regulation. In enacting 28 U.S.C. § 1362 [7] pursuant to this authority, Congress clearly intended to abrogate the states' immunity from suit.

The plain language of § 1362, which extends to "*all* civil actions" (emphasis added), supports this conclusion. See, e.g., *Parden, supra,* 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233; *Hutto v. Finney,* 437 U.S. 678, 693–94, 98 S.Ct. 2565, 2574–2575, 57 L.Ed.2d 522 (1978); *County of Monroe v. Florida,* 678 F.2d 1124 (2d Cir. 1982). Congress' intent to abrogate is further revealed in the legislative history of § 1362, which states that the section provides

> "the means whereby the tribes are assured of the same judicial determination whether the action is brought in their behalf by the Government or by their own attorneys." H.R.Rep. No. 2040, 89th Cong., 2d Sess., 2–3, *reprinted in* 1966 U.S.Code Cong. & Ad.News 3145, 3147.

The House Report characterizes the litigation authorized by the section as "involving issues *identical to* those" which would have been raised in a suit by the U.S. as trustee for the Indian tribes. *Id.* at 3147 (emphasis added). Thus the Supreme Court concluded in *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), that the "congressional purpose [was] to open the federal courts to the kind of claims that could have been brought by the United States as trustee, but for whatever reason were not so brought." *Id.* at 472, 96 S.Ct. at 1640; see also *id.* at 473–75, 96 S.Ct. at 1641–42.

It is clear that the federal government could have sued on behalf of the Oneidas, raising the same claims now being asserted by the Oneida Nation. *Moe, supra,* 425 U.S. at 473, 96 S.Ct. at 1641 (citing *Heckman v.*

*United States,* 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820 (1912)); 28 U.S.C. § 2415(b); see also *United States v. Oneida Nation of New York,* 576 F.2d 870 (Ct.Cl.1978) (holding federal government assumed fiduciary relationship with Oneidas arising from pre-Constitutional treaties and dealings). Such a suit would not be barred by the Eleventh Amendment. *United States v. Mississippi,* 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965); *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). We conclude, therefore, that Congress' intent in enacting § 1362 to provide Indian tribes with a capacity to sue that is as broad in some respects as that of the United States indicates an intent to remove the states' Eleventh Amendment immunity in suits brought by the tribes. *Confederated Tribes of the Colville Indian Reservation v. State of Washington,* 446 F.Supp. 1339, 1350 (E.D.Wash.1978) (relying on *Moe, supra*), aff'd in part and rev'd in part on other grounds, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10, *reh. denied,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980); *Aquilar v. Kleppe,* 424 F.Supp. 433, 436 (D.Alaska 1976) (relying on *Moe, supra*) (dictum). See also Special Master Tuttle, Memorandum and Report on Preliminary Issues 25–29, *Arizona v. California* (U.S. Sup.Ct. Aug. 28, 1979) (unreported), *reprinted in* Joint Reply Brief of Appellants.

Accordingly, we conclude, as did the district court, that the Eleventh Amendment does not bar the claims against the state defendants and the district court is empowered to award appropriate money damages as well as declaratory and injunctive relief.[8]

### (2) *Justiciability*

■ We also affirm the holding below that the claims raised in this lawsuit are

---

**7.** Section 1362 provides that:
"The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

**8.** In light of our holding, we need not determine whether the sovereign status of tribes, their assertion of a sovereign interest in these

claims, and the special relationship between the United States and tribes justifies a lesser standard of proof to establish congressional intent to abrogate the Eleventh Amendment. See 520 F.Supp. at 1307.

We also need not address the claim, not reached by the district court, that 25 U.S.C. § 177 manifests a clear intent by Congress to abrogate the Eleventh Amendment immunity of the states.

justiciable. The defendants contend that: (1) the claims raise nonjusticiable political questions; (2) the duty asserted by the Oneidas cannot be judicially determined; and (3) an appropriate judicial remedy cannot be molded. Because we agree substantially with the reasoning of the district court in dismissing these contentions, we confine ourselves to those arguments requiring additional discussion or which were not addressed below.[9]

In contending that nonjusticiable political questions are raised, defendants argue in reliance on *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), that the issues require initial nonjudicial policy determinations, that they have been committed to a coordinate political department, and that there is a potential for embarrassment from multifarious pronouncements by various branches of the federal government. We note that the political question doctrine is "essentially a function of the separation of powers," *id.,* and we conclude that adjudication of Indian land claims such as the instant action is wholly consistent with the prevailing conceptions of the relationship among the three branches of government concerning the appropriate means to redress the historical wrongs committed against the Native American.

Indian land claims have traditionally been asserted in the courts of this country for resolution. Suits against the United States for money damages, formerly brought before the Indian Claims Commission, 25 U.S.C. §§ 70 *et seq.,* have been transferred to the Court of Claims, 25 U.S.C. §§ 70v *et seq.,* and suits by the tribes or in their behalf by the United States may be brought in federal court pursuant to 28 U.S.C. § 1362. To our knowledge no Indian land claim has ever been dismissed on nonjusticiability grounds, see

Comment, "Indian Land Claims Under the Nonintercourse Act," 44 Albany L.Rev. 110, 133–34 (1979), even though many recent claims assert the possessory rights of Indian tribes to millions of acres of Eastern lands purportedly ceded nearly two hundred years ago. *Id.* at 112 n.14. While legislative solutions are often more desirable and appropriate, see, e.g., Alaska Native Claims Settlement, 43 U.S.C. §§ 1601 *et seq.,* it is equally well recognized that absent such alternative resolution a judicial forum is an appropriate avenue for obtaining relief.

Both branches of the federal government have acknowledged the justiciability of these land claims in numerous ways. Pursuant to its obligations as trustee to Indian tribes to bring suits on their behalf, the Executive Branch through the Interior and Justice Departments has been active in processing and litigating the thousands of claims submitted by Indian tribes. See Vollman, "A Survey of Eastern Indian Land Claims: 1970–1979," 31 Me.L.Rev. 5, 11–12 (1979); H.R.Rep. No. 96–807, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad.News 206, 206–10. Moreover, Congress has repeatedly extended the federal statute of limitations applicable to suits by the federal government on behalf of Indian tribes, 28 U.S.C. § 2415, in order to forestall the rush by the Justice Department to file suits just prior to its expiration, to prevent the unjust extinguishment of recently discovered claims, and to avoid the possible liability of the United States for breach of its fiduciary duty to bring timely actions.[10] Both the representations by the Justice Department of the need for such extensions and the response of Congress are indicative of their acknowledgement that such suits could be properly pursued unless the disputes are otherwise resolved. Moreover, when Congress in 1980 extended the deadline yet again to Decem-

---

**9.** We affirm the district court's holding that the Oneidas have standing to bring this suit.

**10.** See H.R.Rep.No.96–807, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad.News 206 (1980 extension); H.R.Rep.No. 95–375, 95th Cong., 1st Sess., *reprinted in*

[1977] U.S.Code Cong. & Ad.News 1616 (1977 extension); Comment, "Indian Land Claims Under the Nonintercourse Act," 44 Albany L.Rev. 110, 113 n.17 (1979); Vollman, "A Survey of Eastern Indian Land Claims: 1970–1979," 31 Me.L.Rev. 5, 11 (1979).

ber 31, 1982, it added a § 2, Pub.Law No. 96–217, which provides that for those claims "that the Secretary of the Interior or the Attorney General believes are not appropriate to resolve by litigation," "the Secretary ... shall submit to the Congress legislative proposals to resolve those Indian claims." The clear implication is that absent such a submission, a suit may go forward either by the tribe itself or by the United States on the tribe's behalf.

Further indication of such acknowledgement can be found in the legislative settlements that Congress has enacted to resolve pending Indian land claims. For example, Congress enacted the Maine Tribes Settlement Act, P.L. No. 96–420, 94 Stat. 1785, Oct. 10, 1980, 25 U.S.C. §§ 1721–35, precisely in order to *forestall* what the Justice Department described as "potentially the most complex litigation ever brought in the Federal courts with social costs and economic impacts without precedent and incredible litigation costs to all parties." H.R.Rep. No. 96–1353, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad. News 3786, 3789. The legislative history makes clear both Congress' and the Executive Branch's understanding that absent a settlement which was deemed "critical," *id.* at 3790, the litigation would go forward in spite of the staggering disruption that would result. Nowhere was it suggested that courts would be acting improperly in adjudicating the claim of the Maine Indians.[11] Moreover, the introduction into Congress, in the aftermath of recent court victories by Indian tribes, of numerous bills to authorize the extinguishment of all tribal rights in the disputed areas is further evidence that without such extinguishment the claims are properly entertained by the courts. See Newton, "At the Whim of the Sovereign: Aboriginal Title Revisited," 31 Hast.L.J. 1215, 1216 n.9 (1980) (listing such unsuccessful "backlash" bills).

■ The defendants also maintain that the duty asserted by the Oneidas cannot be judicially determined, *Baker v. Carr, supra,* 369 U.S. at 198, 82 S.Ct. at 699, because the Articles of Confederation, the 1783 Proclamation and the 1784 Treaty of Fort Stanwix were not laws binding on the State of New York. Moreover, even if the Treaty of Fort Stanwix were binding, defendants allege that it was superseded by the Treaty of Canandaigua, 7 Stat. 44 (1794), which commits the Oneidas to Congress for their remedy. These contentions do not concern the justiciability of the Oneidas' claim but rather whether on the merits the Oneidas have stated a claim at all. The determination of whether certain federal enactments were intended to and still protect the Oneidas' Indian title from unauthorized extinguishments presents the very types of questions that have "always been for resolution by the courts." *Joint Tribal Council of Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, 664 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir. 1975). The inquiry required here is no different in principle from that made by the Court of Claims in *Oneida Nation of New York, supra,* 576 F.2d 870 (1978), when it held that the Proclamation of 1783 and the 1784 Treaty of Fort Stanwix imposed a fiduciary obligation upon the federal government toward the Oneidas. The determination of title to or rights regarding aboriginal property based upon the construction of an Indian treaty or other federal law is clearly justiciable. See, e.g., *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 674–79, 99 S.Ct. 3055, 3068–71, 61 L.Ed.2d 823 (1979); *United States v. Shoshone Tribe,* 304 U.S. 111, 116–17, 58 S.Ct. 794, 797–98, 82 L.Ed. 1213 (1938).

■ We also reject the contention that an appropriate judicial remedy cannot be molded. Even were no other relief appropriate, the request for declaratory relief would alone render the claims justiciable. *Powell v. McCormack,* 395 U.S. 486, 517–18,

---

**11.** See also the legislative history of the Alaska Native Claims Settlement Act, P.L. 92–203, Dec. 18, 1971, 85 Stat. 688, 43 U.S.C. §§ 1601–28, which reveals Congress' recognition that while a legislative solution is preferable, a judicial resolution would be proper. H.R.Rep.No. 92–523, 92d Cong., 1st Sess., *reprinted in* [1971] U.S.Code Cong. & Ad.News 2192, 2194.

89 S.Ct. 1944, 1961–62, 23 L.Ed.2d 491 (1969). Moreover, as the Supreme Court held in *Yankton Sioux Tribe v. United States,* 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926), if the ejectment of current occupants and the repossession by the Indians of a wrongfully taken land is deemed an "impossible" remedy, *id.* at 357, 47 S.Ct. at 143, the court has authority to award monetary relief for the wrongful deprivation. *Id.* at 359, 47 S.Ct. at 144. The claim for "fair rental value" is not so vague or indeterminable that an appropriate remedy could not be designed.

 The defendants point to the scale of the wrong alleged and the size of the remedy sought as rendering the claims nonjusticiable. We do not doubt that a declaratory judgment declaring the New York treaties invalid could cause substantial dislocations in the affected lands casting a cloud over all current title holders, and that the impact of a monetary award could be heavy.[12] Yet we know of no principle of law that would relate the availability of judicial relief inversely to the gravity of the wrong sought to be redressed. Rather, the courts have in numerous contexts treated as justiciable claims that resulted in wideranging and "disruptive" remedies. See, e.g., *Baker v. Carr, supra* (wide-scale reapportionment); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, supra,* 443 U.S. at 677 n.22, 685, 99 S.Ct. at 3070 n.22, 3074 (increasing Indians' share of salmon run from 2% to 50% of industry catch); see generally Fiss, "The Supreme Court, 1978 Term—Foreword: The Forms of Justice," 93 Harv.L.Rev. 1 (1979) (structural reform litigation involving large social institutions). Thus the First Circuit treated as justiciable claims tested in *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir. 1975), and its holding that the Nonintercourse Act applied to the subject land transactions cast a cloud over the title to the 12 million acres of land sought by the

plaintiffs and raised the specter of a possible award of $25 billion in alleged trespass damages. See Paterson & Roseman, *supra,* 31 Me.L.Rev. 115.

Courts have not been blind to the disruption caused by the mere filing of such lawsuits, see, e.g., *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 530–32 (N.D.N.Y.1977), on remand from 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), and may take into account the "impossibility," *Yankton, supra,* of repossession in designing an appropriate remedy. Alternatively, legislative solutions may be available. Indeed, plaintiffs point out that every major Indian land claim to date has been settled with the United States and states, not private parties, providing the settlement funds. See, e.g., Alaska Native Claims Settlement Act, *supra;* Rhode Island Indian Claims Settlement Act, P.L. 95–395, 92 Stat. 813, Sept. 30, 1978, 25 U.S.C. §§ 1701–1716; Maine Tribes Settlement Act, P.L. 96–420, 94 Stat. 1785, Oct. 10, 1980, 25 U.S.C. §§ 1721–1735. However preferable a legislative solution might be, in its absence the Oneidas' claims are justiciable notwithstanding the complexity of the issues involved and the magnitude of the relief requested.

### (3) *Time-Bar*

Defendants contend as a third defense that the Oneidas' claims are barred by the nearly 200 years that have elapsed since the New York treaties were concluded. We reject this contention. As we recently noted, "[d]efenses [in Indian claims cases] based upon state adverse possession laws and state statutes of limitations have been consistently rejected." *Mohegan Tribe v. Connecticut,* 638 F.2d 612, 614–15 & n.3 (2d Cir.), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1980) (citing *Oneida Indian Nation v. County of Oneida,* 434 F.Supp. 527, 541–44 (N.D.N.Y.1977); *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 783–85 (D.Conn.1976); *Narragansett Tribe of Indi-*

---

**12.** As discussed above, the legislative history of the Maine settlement evinces no indication that the claims raised there were non-justiciable,

even though the Maine plaintiffs were suing for $25 billion in trespass damages and seeking repossession of 12 million acres of land.

ans v. *Southern Rhode Island Land Development Corp.*, 418 F.Supp. 798, 804–06 (D.R.I.1976)).

▇ It is clearly established that a suit by the United States as trustee on behalf of an Indian tribe is not subject to state delay-based defenses. *Board of Commissioners v. United States*, 308 U.S. 343, 350–51, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939); *Utah Power and Light Co. v. United States*, 243 U.S. 389, 408–09, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *Cramer v. United States*, 261 U.S. 219, 233–34, 43 S.Ct. 342, 346, 67 L.Ed. 622 (1923). It would be anomalous to allow the trustee to sue under more favorable conditions than those afforded the tribes themselves. *County of Oneida, supra*, 434 F.Supp. at 543; *Schaghticoke, supra*, 423 F.Supp. at 785. We reach this conclusion because "the interests sought to be protected . . . are the same, no matter who the plaintiff may be." *Capitan Grande Band of Mission Indians v. Helix Irrigation Dist.*, 514 F.2d 465, 471 (9th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975). Cf. *Ewert v. Bluejacket*, 259 U.S. 129, 137–38, 42 S.Ct. 442, 444, 66 L.Ed. 858 (1922) (neither the doctrine of laches nor the state statute of limitations bars a suit by individual Indians challenging land transactions for violating federal statutory restrictions on alienation). See also *Moe, supra.*

▇ In addition, to permit a state to enact and invoke a time-bar would in effect allow a state to terminate the relationship of trust and guardianship between the United States and the Oneidas. See *Oneida Nation of New York, supra*, 576 F.2d 870. Such a relationship, once established by federal law, may only be terminated by federal law. See *United States v. Nice*, 241 U.S. 591, 598, 36 S.Ct. 696, 697, 60 L.Ed. 1192 (1916); *Tiger v. Western Investment Co.*, 221 U.S. 286, 315, 31 S.Ct. 578, 586, 55 L.Ed.

738 (1911); *Joint Tribal Council, supra*, 528 F.2d at 380. See also *County of Oneida, supra*, 414 U.S. at 670, 94 S.Ct. at 778 (termination of Indian right of occupancy is "exclusively the province of federal law"). We conclude, therefore, that state law cannot operate subsequently to validate land transactions that occurred in violation of federal law.

▇ There remains the question whether a delay-based defense founded on federal law may be asserted. See *Mohegan Tribe, supra*, 638 F.2d at 615 n.3 (alluding to but not reaching existence of defense based on "federal common law of laches"). Assuming some federal time-bar might be applicable, we can turn for guidance to 28 U.S.C. § 2415, which provides a federal statute of limitations for suits brought by the United States on behalf of tribes. Under § 2415(a) & (b), an action for money damages based on a contract or tort that accrued prior to the section's enactment on July 18, 1966, is timely if filed prior to December 31, 1982, and under § 2415(c) there is no time limit for an action to "establish the title to, or right of possession of, real or personal property." Without having to decide whether § 2415 applies to restrict suits by tribes,[13] we believe for reasons elaborated above that at the very least suits by tribes should be held timely if such suits would have been timely if brought by the United States. Accordingly, since the instant action accrued prior to 1966 and was filed in 1979, we hold that it is timely.

## The Legal Sufficiency of the Claims

(1) *Claims based on the Articles of Confederation, the Proclamation of 1783 and the 1784 Treaty of Fort Stanwix*

The district court dismissed plaintiffs' principal claim—that the New York State

**13.** While the Ninth Circuit in *Capitan Grande Band of Mission Indians v. Helix Irrigation Dist.*, 514 F.2d 465, 469 (9th Cir.), *cert. denied*, 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975), held § 2415 applicable to suits by tribes, it appears to have held merely that tribes should "*benefit* from the provisions of § 2415." *Id.* at 470 (emphasis added). The

House Conference Report indicates that "there is a split of opinion on the question as to whether [§ 2415] will bar an Indian tribe, band or group from bringing such an action on their own behalf." H.R.Rep. No. 96–843, 96th Cong., 2d Sess., *reprinted in* [1980] U.S.Code Cong. & Ad.News at 215-16.

treaties of 1785 and 1788 violated the Articles of Confederation, the Continental Congress' Proclamation of September 22, 1783, and the 1784 Treaty of Fort Stanwix—on the grounds (1) that the plaintiffs failed to establish that New York had by the Articles of Confederation delegated to the Continental Congress the sole and exclusive authority to extinguish Indian title to lands within New York's borders, (2) that the 1783 Proclamation did not apply to such lands, and (3) that in any event, assuming the Proclamation did apply, both it and the Fort Stanwix Treaty were *ultra vires* by reason of the federal government's lack of authority. Without conducting an evidentiary hearing the district court based its decision upon the language of the Articles of Confederation, their legislative history, and contemporary interpretations of one of the pertinent clauses (Art. IX, cl. 4).

By footnote Judge McCurn dismissed plaintiffs' claim of federal authority grounded on Article IX, clause 1, which granted Congress the "sole and exclusive right and power of determining on peace and war ... [and] entering into treaties and alliances...." He reasoned that the term "treaty" did not refer to contracts with Indian Nations but only to those with foreign nations, citing as his sole authority a law review note, "State Sovereignty and Indian Land Claims: The Validity of New York's Treaties Prior to the Nonintercourse Act of 1790," 31 Syr.L.Rev. 797, 816–17 (1980).[14] Plaintiffs' claim based on Article IX, clause 4, was rejected on the grounds that because of the ambiguity and unresolved inconsistencies in its language it could not be construed as expressly delegating to the federal government the sole and exclusive authority to extinguish by treaty

Indian title to tribal land located within New York and that the states, as successors in interest to the authority of the British Crown, may well have retained under Article II of the Articles the sovereign power to extinguish Indian aboriginal title. Not being able to resolve the ambiguity and facial inconsistencies on the basis of the facts before it, and not finding any contemporary consensus as to two limiting provisions of clause 4 (i.e., that Congress' authority was limited to "Indians, not members of any state" and that a state's legislative right within its own limits might not be infringed) the district judge felt constrained to dismiss the complaint.

 Thus, in ruling upon the motion to dismiss, the district court was faced with the difficult task of interpreting pertinent provisions of the Articles, some of which appeared on their face to be ambiguous, with possible internal inconsistencies. It is the court's duty in such circumstances to make every effort give effect to every word of a constitution, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 174, 2 L.Ed. 60 (1803); *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 396, 5 L.Ed. 257 (1821), to resolve ambiguities, and to reconcile inconsistencies. The starting point, of course, is the language of the pertinent Articles of Confederation. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Where, as here, the language is ambiguous, contemporary construction and Congress' own interpretation are entitled to weight. *McPherson v. Blacker,* 146 U.S. 1, 27, 13 S.Ct. 3, 7, 36 L.Ed.2d 869 (1892); *Cohens v. Virginia, supra,* 19 U.S. at 417; *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 314, 13 L.Ed. 996 (1851). The surrounding circumstances, including cus-

---

**14.** Although the law review note suggests that the word "treaty" might have had a dual meaning and that a treaty with an Indian tribe preempting title to land may not have been regarded as a "treaty in a constitutional sense until the first reenactment of the Nonintercourse Act of 1793," Act of March 1, 1793, 1 Stat. 329, 330–31, the sole basis for this suggestion is an inference from pre-Revolutionary British correspondence, 31 Syr.L.Rev. at 816–17. The writer concluded that "When addressing the states'

power to interfere with the Indians' sovereign right of self-determination, however, the Supreme Court ruled that even Indian treaties under the Articles of Confederation were of equal status with foreign treaties," citing *United States v. 43 Gallons of Whiskey,* 93 U.S. 188, 193, 196–97, 23 L.Ed. 846 (1876), and Chief Justice Marshall's decision in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 549, 8 L.Ed. 483 (1832).

tom, usage, and the factual context in which the words were used, may also be of importance in resolving a facial ambiguity or inconsistency.

 In approaching this task the district court, after reviewing the language and meager legislative history of the pertinent Articles (no record of debates or committee reports was made), took judicial notice of pertinent individual records, notes, correspondence, histories, articles and other data, which may collectively be described as "historical evidence," as aids in interpreting the Articles, the Proclamation of 1783, and the 1784 Fort Stanwix Treaty. When there is no dispute as to the authenticity of such materials and judicial notice is limited to law, legislative facts, or factual matters that are incontrovertible, such notice is admissible. Fed.R.Evid. 201(b), 1 J. Weinstein, *Weinstein's Evidence: United States Rules* ¶¶ 200[01], [03], at 200–2 to 200–5, 200–14 to 200–19; J. Moore, 10 *Moore's Federal Practice* § 201.20. To determine the reason for and meaning of a statute the Supreme Court, beginning with *Worcester v. Georgia, supra,* 31 U.S. (6 Pet.) at 548, has referred to undisputed background history of the period when the statute was passed, see *Leo Sheep Co. v. United States,* 440 U.S. 668, 669, 99 S.Ct. 1403, 1404, 59 L.Ed.2d 677 (1979); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206–07, 98 S.Ct. 1011, 1019–20, 55 L.Ed.2d 209 (1978); *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). In virtually all of these cases there was no dispute regarding the authenticity of the historical materials or facts used to decide the ultimate issue, see, e.g., *Mattz, supra,* 412 U.S. at 494, 93 S.Ct. at 2252. However, when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence, cf. *Alvary v. United States,* 302 F.2d 790, 794 (2d Cir. 1962) ("It was error for the trial judge to take judicial notice of text books that were not a part of the record"), at least without affording an opposing party the opportunity to present information which might challenge the fact or the propriety of noticing it. See 10 J. Moore,

*Moore's Federal Practice* § 201.50 (1976), McCormick, *Evidence* 708 (1954). Judicial notice of a disputed fact should not ordinarily be taken as the basis for dismissal of a complaint on its face. 1 J. Weinstein, *supra,* ¶ 200[06], at 200–30. The better course is to conduct an evidentiary hearing at which the plaintiff may have its "day in court," and, through time-honored methods, test the accuracy of defendants' submissions and introduce evidence of its own.

 In the present case evidence of contemporary construction of the key Articles and surrounding circumstances relevant to their meaning, of which the district court took notice, contains statements with respect to factual issues, such as the understanding of representatives of federal and state governments and the Oneidas regarding the meaning of the disputed clauses, the pre-Revolutionary practices of the British Crown with respect to the matters involved, and the post-Revolutionary practices of the new federal government and the states under the clauses. The district court drew heavily upon this extrinsic historical evidence as the basis for its interpretation of the Articles even though the evidence had not been the subject of cross-examination or analysis through expert testimony and may not have been put in perspective by introduction of other relevant evidence. In short, both sides and the court appear to have referred to, relied upon, and quoted from numerous untested primary and secondary historical sources, including history books, treatises, and other papers. We agree with appellants that the district court should not have granted defendants' Rule 12(b)(6) motion on the basis of this type of evidence without affording the plaintiffs an evidentiary hearing in order to clarify the meaning and context of statements relied on and the weight to be given to them.

More specifically, we believe that the district court erred in rejecting without an evidentiary hearing the claim that by Article IX, clause 1, the states delegated to the Continental Congress the authority to enter into treaties of peace with the Indian na-

tions which would protect them against extinguishment, without federal consent, of title to their lands within the boundaries of a state.[15] It is undisputed that upon declaring their independence the states gave the new Continental Congress the sole and exclusive power to declare war upon and to make peace and alliances with others. Before the Articles of Confederation were adopted it was the Continental Congress, as distinguished from the individual states, which on behalf of all 13 colonies declared their independence, organized the Continental Army under the command of George Washington, and directed its war operations against Great Britain. Congress also sent representatives to France to negotiate an alliance with the French monarchy and initiated and controlled relations with hostile Indian nations. Indeed, the Supreme Court has recognized that these external powers of war and peace devolved directly from the British Crown upon Congress when the latter dissolved the bonds of union with Great Britain and conducted the ensuing Revolutionary War. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 558, 8 L.Ed. 483 (1832) (Marshall, C. J.); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 316–17, 57 S.Ct. 216, 219, 81 L.Ed. 255 (1936).

"The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the Union. Is this the rightful exercise of power, or is it usurpation?

"While these states were colonies, this power, in its utmost extent, was admitted to reside in the crown. When our revolutionary struggle commenced, congress was composed of an assemblage of depu-

ties, acting under specific powers granted by the legislatures, or conventions of the several colonies. It was a great popular movement, not perfectly organized; nor were the respective powers of those who were intrusted with the management of affairs accurately defined. The necessities of our situation produced a general conviction, that those measures which concerned all must be transacted by a body in which the representatives of all were assembled, and which could command the confidence of all; congress, therefore, was considered as invested with all the powers of war and peace, and congress dissolved our connection with the mother country, and declared these united colonies to be independent states. Without any written definition of powers, they employed diplomatic agents to represent the United States at the several courts of Europe; offered to negotiate treaties with them, and did actually negotiate treaties with France. From the same necessity, and on the same principles, congress assumed the management of Indian affairs; first, in the name of these united colonies; and afterwards, in the name of the United States. Early attempts were made at negotiation, and to regulate trade with them. These not proving successful, war was carried on, under the direction, and with the forces of the United States, and the efforts to make peace by treaty were earnest and incessant. *The confederation found congress in the exercise of the same powers of peace and war, in our relations with Indian nations, as with those of Europe.*" *Worcester v. Georgia, supra,* 31 U.S. at 557 (emphasis added).

The same views were echoed by the Supreme Court more than a century later in

---

**15.** In treating the claims summarily Judge McCurn acted under the impression that "[p]laintiffs appear to have abandoned this claim and chosen to rely solely on Cl. 4." However, plaintiffs vigorously deny abandonment, pointing to specific allegations in their complaint (Par. 65 in 78–CV–104, and par. 54 in 79–CV–798). They argue that they concentrated on clause 4 below in response to defendants' contention that its expressed limitations

modified the grant of power to Congress under both clauses 1 and 4. Moreover, they point out that since Congress authorized the 1784 Fort Stanwix Treaty pursuant to its clause 1 powers, they implicitly relied on clause 1 in advancing arguments before the district court based on that treaty. Since the plaintiffs' arguments based on clause 1 present neither a wholly different theory nor a new claim for relief they are not precluded from advancing it here.

*United States v. Curtiss-Wright Export Corp., supra:*

"As a result of the separation from Great Britain by the colonies acting as a unit, *the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America.* Even before the Declaration, the colonies were a unit in foreign affairs, acting through a common agency—namely the Continental Congress, composed of delegates from the thirteen colonies. That agency exercised the powers of war and peace, raised an army, created a navy, and finally adopted the Declaration of Independence.... When, therefore, the external sovereignty of Great Britain in respect of the colonies ceased, it immediately passed to the Union.

"[The] Union declared by the Articles of Confederation to be 'perpetual,' was the sole possessor of external sovereignty...." *United States v. Curtiss-Wright Export Corp., supra,* 299 U.S. at 316–17, 57 S.Ct. at 219 (emphasis added).

■ Thus, beginning with the Declaration of Independence and the formation of the Continental Congress the member states had no more power to make war or enter into treaties of peace or alliance than they had had as colonies under the British Crown. The Articles of Confederation appear merely to have confirmed, rather than to have originated, Congress' peace-treating power.

■ In any event, by the time of the Proclamation of 1783 and the 1784 Treaty of Fort Stanwix that authority was vested by Article IX, clause 1, exclusively in the new federal government and under Article XIII, the Supremacy Clause,[16] treaties entered into by Congress were binding on the states and paramount to any conflicting acts on the part of their legislatures. *United States v. Curtiss-Wright Export Corp., supra.*

■ It also appears beyond dispute that the 1784 Treaty of Fort Stanwix with the Six Nations Iroquois Confederacy, which assured the Oneidas possession of the lands on which they were settled, was entered into by the federal government in the exercise of its peace-making powers. Four of the nations (Seneca, Cayuga, Onondaga and Mohawk) had joined the British in the Revolutionary War and two (Oneida and Tuscarora) had sided with Congress. Since these six members of the Iroquois Confederacy were not parties to the 1783 Treaty of Paris, their rights as belligerents and allies, respectively, had not yet been resolved. Considerable authority supports the view that maintenance of peaceful or at least neutral relations with the Six Nations Confederacy was an important factor to the federal government in its conduct of the Revolutionary War, since they were the most powerful of the Indian nations and had had a history of alliance and friendship with the British Crown, as was evidenced by its Proclamation of 1763 and its 1768 Treaty of Fort Stanwix with them, protecting their lands. See B. Graymont, *The Iroquois in the American Revolution,* 65–72 (1972), and H. Upton, *The Everett Report in Historical Perspective,* 13–14 (1980). There is also evidence that as late as May 1, 1783, fighting with the Indians continued on the Pennsylvania border, XXIV *Jour. of the Cont. Cong.* 319, and that in its efforts to make peace with the Indians, Congress' representative (Ephraim Douglas) was prevented by the British at Niagara from delivering Congress' message to the Six Nations but was informed by their representative (Joseph Brant, Mohawk war leader) that no peace treaty would be possible without securing them their land rights, which

16. "Every State shall abide by the determination of the United States in Congress assembled, on all questions which by this confederation are submitted to them. And the articles of this confederation shall be inviolably observed by every State, and the Union shall be perpetual; nor shall any alteration at any time hereafter be made in any of them, unless such alteration be agreed to in a Congress of the United States, and be afterwards confirmed by the Legislatures of every State." Art. XIII, Articles of Confederation, reprinted at U.S.C.A.Const., p. 17.

led Douglas to report that unless peace was negotiated the Six Nations were "ready for War, and will desolate the Frontiers of Pennsylvania if the United States resolve to conquer their land," quoted in R. Downes, *Council Fires on the Upper Ohio,* 287 (1904). See generally XVIII *Buffalo Historical Society Publications* 121–34 (F. Severance ed. 1914).

The district court's footnote holding that Article IX, clause 1 was inapplicable because the Oneidas did not qualify as a "nation" with whom Congress could enter into "treaties and alliances" as used in clause 1 must be rejected. As Chief Justice Marshall observed in *Worcester v. Georgia, supra,* 31 U.S. (6 Pet.) at 559:

> "The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed; and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. The very term 'nation,' so generally applied to them, means 'a people distinct from others.' The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently, admits their rank among those powers who are capable of making treaties. The words 'treaty' and 'nation,' are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well-understood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth; they are applied to all in the same sense." *Worcester v. Georgia, supra,* 31 U.S. (6 Pet.) at 559–60.

See, in accord, *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979) ("A Treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations"); see also *Lone Wolf v. Hitchcock,* 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903); *Holden v. Joy,* 84 U.S. (17 Wall.) 211, 242, 21 L.Ed. 523 (1872); C. Butler, 1 *The Treaty-Making Power of the United States* §§ 110–16, 160, at 191–201, 278–81 (1902).

Since Clause 1 does not on its face restrict Congress' treaty-making powers to those exercised in relation to "foreign" nations or to "states" it is unnecessary to determine whether Indian nations or tribes are to be characterized as "foreign" or as "states." Indian tribes, although not "foreign" as that term is used to describe countries beyond the seas, see *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 26–27, 8 L.Ed. 25 (1831), were nevertheless viewed as separate, independent, self-governing "nations" or legal entities, with their own internal social and governmental framework under which they functioned even though their tribal lands (as was the case with the Oneidas) were located wholly within the designated boundaries of a colony or, later, a state. See *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 71, 98 S.Ct. 1670, 1683, 56 L.Ed.2d 106 (1978); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *Worcester v. Georgia, supra,* 31 U.S. (6 Pet.) at 581. Only in their external relations with non-Indians did Indians subject themselves to state law. See, e.g., *Goodell v. Jackson,* 20 Johns. 694, 710–15 (N.Y.1823); *Oneida Indian Nation v. United States,* 37 Ind.Cl.Com. 522, 547 (1976), *aff'd,* 576 F.2d 870 (Ct.Cl. 1978). In concurring in Chief Justice Marshall's rejection of the contention that a treaty with an Indian tribe was not a "treaty" within the meaning of the Articles Justice McLean noted:

> "It is said, that these treaties are nothing more than compacts, which cannot be considered as obligatory on the United States, from a want of power in the Indians to enter into them. What is a

treaty? The answer is, it is a compact formed between two nations or communities, having the right of self-government. Is it essential, that each party shall possess the same attributes of sovereignty, to give force to the treaty? This will not be pretended; for, on this ground, very few valid treaties could be formed. The only requisite is, that each of the contracting parties shall possess the right of self-government, and the power to perform the stipulations of the treaty. Under the constitution, no state can enter into any treaty; and it is believed, that, since its adoption, no state, under its own authority, has held a treaty with the Indians." *Worcester v. Georgia, supra,* 31 U.S. (6 Pet.) at 581.

Congress' maintenance of peaceful relations with the Indians was tied directly to its conduct of the Revolutionary War and Congress diligently exercised its powers to promote peace with them, culminating in the Proclamation of 1783 to be followed by the Fort Stanwix Treaty of 1784. Probably the most important factor in arriving at a peace treaty was the preservation to the Indians of their rights to occupy lands held by them. Indeed, the United States commissioners who negotiated the Fort Stanwix Treaty were directed by Congress to establish peace with the Six Nations, to reassure them of their rights to their tribal lands, and to give favored treatment to the Oneidas. XXV *Jour. of the Cont. Cong.* 687. Moreover, the commissioners assured the Six Nations that without Congress' consent no state had the right to act contrary to the treaty. Thus, the Fort Stanwix Treaty, including its express assurance to the Oneidas regarding their lands was an exercise by Congress of its sovereign powers under Article IX, clause 1, of the Articles of Confederation. Indeed, when General George Washington learned of New York's effort to sabotage the negotiation of the treaty he observed that if New York succeeded "it will end in another Indian War ... [since the Oneidas] will not suffer their Country (if it was our policy to take it before we could settle it) to be wrested from them without another struggle." Let-

ter from Washington to James Duane dated September 7, 1783, 27 *The Writings of George Washington,* 135 (J. Fitzpatrick ed. 1938). This is confirmed by Felix Cohen, a leading authority on Indian law, who stated:

"Had New York's attempts in obstructing the peace treaty prevailed over the efforts of the Central Government in this respect, New York would have probably consolidated the Iroquois instead of dividing them, and this might well have resulted in a united League serving as the spear head of a cruel, prolonged, and costly Indian war of all of the western Indians (more than 35 tribes) under the influence and leadership of the Iroquois.

"Though under the Articles of Confederation there was a question of whether the Confederated Government was invading the rights of the State of New York relative to the Iroquois, the necessity of the times and the importance of these Indians in relation to all of the states made it imperative that the Central Government take definitive action." F. Cohen, *Handbook of Federal Indian Law* 418 (1942).

The Fort Stanwix Treaty was reviewed by a congressional committee which made its report on December 3, 1774, read the treaty to Congress and recommended its approval. Although there is no record of a formal approval by Congress it was on June 3, 1785, printed by Congressional order and later recorded in an 1846 official compilation of Indian treaties, compiled by order of Congress. *Treaties Between the United States and the Several Indian Tribes,* 7 Stat. 15 (1846). That Congress viewed the treaty as binding is attested to by its instructions on October 4, 1785, to inform the Oneidas

"that congress will preserve inviolate the Treaty of Fort Stanwix, concluded between their commissioners and the Chiefs of the Six Nations, and that the Reservations in that treaty in favor of any of the said Tribes will be at all times faithfully regarded by Congress." XXIX *Jour. of the Cont. Cong.* 806.

Thus the district court erred in summarily dismissing without a hearing plaintiffs' claim based on Article IX, clause 1. Absent further evidence, clause 1 and the Treaty of Fort Stanwix appear to be binding on the State of New York, subject to the question (discussed below) of whether they are modified by clause 4. Under Article XIII the treaty was paramount, preempting any contrary state law. See E. Corwin, *The Doctrine of Judicial Review* 40–41 (1963); Note, "The United States and the Articles of Confederation: Drifting Toward Anarchy or Inching Toward Commonwealth?," 88 Yale L.J. 142, 152–54 (1978); XXXII *Jour. of the Cont. Cong.* 177–78 (Hill ed. 1936).[17] Contemporary decisions by state courts, which prior to the adoption of the Constitution adjudicated federal law issues, treated the Articles and treaties made by Congress thereunder as the supreme law of the land.[18]

The next question is whether Congress' "sole and exclusive right and power" under clause 1 of "entering into treaties and alliances" is modified by the two conditions in clause 4 which modify its "sole and exclusive right" under that clause of "managing all affairs with the Indians." Those two conditions are (1) that the Indians be "not members of any of the States," and (2) that the "legislative right of any State within its own limits be not infringed or violated." Under ordinary principles of construction it would seem unlikely that the provisos of clause 4 would modify the grant of authority under clause 1, especially since the effect would be to frustrate Congress' power to make peace with the Indians, which turned on its ability to guarantee them their continued occupancy of their lands, subject only to such Indian compacts with states or individuals as might later be approved by the federal government. Otherwise the federal guarantee of Article II of the Fort Stanwix Treaty pursuant to clause 1 would be worthless since it could be undone by any state without Congress' consent. One possible construction, which would give effect to both clauses 1 and 4 of Article IX, is that a state may exercise its rights under clause 4 except when to do so would conflict with Congress' exercise of its exclusive external authority to enter into peace treaties and alliances under clause 1, in which event congressional consent would be required before the state could act. This rationale would be based on the ground that, regardless of any dispute over the allocation of authority between the federal and state governments to extinguish Indian title under clause 4, it is undisputed that Congress had the exclusive authority under clause 1 to enter into peace treaties with the various Indian nations.

---

**17.** When some states violated the Treaty of Paris with Great Britain the Continental Congress issued a statement to the states:

"We have deliberately and dispassionately examined and considered the several facts and matters urged by Britain as infractions of the treaty of peace on the part of America, and we regret that in some of the States too little attention appears to have been paid to the public faith pledged by that treaty.... Let it be remembered that the thirteen Independent Sovereign States have by express delegation of power, formed and vested in us a general though limited Sovereignty for the general and national purposes specified in the Confederation. In this Sovereignty they cannot *severally participate (except by their* Delegates) nor with it have concurrent Jurisdiction, for the 9th Article of the Confederation most expressly conveys to us the sole and exclusive right and power of determining on war and peace, and of entering into treaties and alliances, etc. When therefore a treaty is constitutionally made ratified and published by us, it immediately becomes binding on the whole nation and superadded to the laws of the land, without the intervention of State Legislatures....

"In cases between Individuals, all doubts respecting the meaning of a treaty, like all doubts respecting the meaning of a law, are in the first instance mere judicial questions, and are to be heard and decided in the Courts of Justice having cognizance of the causes in which they arise; and whose duty it is to determine them according to the rules and maxims established by the laws of Nations for the interpretation of treaties. From these principles it follows of necessary consequence, that no individual State has a right by legislative Acts to decide and point out the sense in which their particular Citizens and Courts shall understand this or that Article of a treaty." XXXII *Jour. of the Cont. Cong.* 176, 177–79.

**18.** *Respublica v. Gordon,* 1 U.S. (1 Dall.) 233, 1 L.Ed. 115 (Pa.1788).

"In *Johnson v. M'Intosh,* 8 Wheat. 543 [5 L.Ed. 681] (1823), the Court refused to recognize land titles originating in grants by Indians to private parties in 1773 and 1775; those grants were contrary to the accepted principle that Indian title could be extinguished only by or with the consent of the general government.

. . . . .

"It is true that the United States never held fee title to the Indian lands in the original States as it did to almost all the rest of the continental United States and that fee title to Indian lands in these States, or the pre-emptive right to purchase from the Indians, was in the State, *Fletcher v. Peck,* 6 Cranch 87 [3 L.Ed. 162] (1810). But this reality did not alter the doctrine that federal law, treaties, and statutes protected Indian occupancy and that its termination was exclusively the province of federal law." *Oneida Indian Nation v. County of Oneida, supra,* 414 U.S. at 669, 670, 94 S.Ct. at 778. However, this is an issue to be resolved upon remand after an evidentiary hearing.

If upon remand it is determined that the two clause 4 provisos do not modify Congress' peace-making powers under clause 1, the district court must next decide whether, without regard to clause 4, the 1784 Treaty of Fort Stanwix must be interpreted as precluding the State of New York from unilaterally extinguishing Indian title to Oneida tribal land located within that state's geographical borders. Article II of the treaty provides that "[t]he Oneida and Tuscarora nations *shall be secured* in the possession of lands on which they are settled" (emphasis added). This language does not expressly prohibit states from purchasing Indian lands. However, plaintiffs argue that federal treaties with Indians are to be liberally construed and that an explicit prohibition is unnecessary when it may be implied from the surrounding circumstances, citing *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Washington v. Washington State*

*Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 30, 61 L.Ed.2d 823 (1979); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144, 100 S.Ct. 2578, 2584, 65 L.Ed.2d 665 (1980). They contend that, regardless whether New York's purchase of a small parcel of land might be permissible, to permit extinguishment by purchase of the Oneidas' title to over 5,000,-000 acres, or over 90% of their tribal land, would render Article II of the treaty a nullity. In support of their contention that it was not so intended, plaintiffs point to a letter of Benjamin Harrison, Governor of Virginia, describing the Fort Stanwix Treaty as a treaty that "guaranteed to [the Oneidas] all their lands within the State of New York," and to a congressional committee report recommending that an Indian agent be instructed to inform the Indians "that congress will preserve inviolate the Treaty of Fort Stanwix . . . and that the Reservations in that treaty in favor of any of the said Tribes will at all times be faithfully regarded by Congress." XXIX *Jour. of the Cont. Cong.* 806. The federal treaty commissioners, moreover, are reported to have expressly advised the Six Nations that no state had a right to transact business with them without authority of Congress. II *The Olden Time* 407 (N. Craig ed. 1848). There is also evidence that Congress had guaranteed the Six Nations their land rights in return for a cession of their land interests in the Ohio Valley, and that when Oliver Wolcott, one of the commissioners, brought the treaty to Congress, one member (Samuel Hardy) wrote that "The commissioners have guarantied to them all their land within the state of New York except the posts of Oswego and Niagara with the carrying place and four Miles along the lake from Niagara to Buffalo Creek which empties into lake Erie. The six Nations in return have ceded to the united states all their *Claim* westward between lake Erie and the Ohio." VII *Letters of the Members of the Continental Congress* 614 (Burnett ed. 1934).

Defendants, on the other hand, rely upon Congress' following instruction to the Fort Stanwix negotiators:

"[S]aid commissioners are therefore instructed to reassure the said tribes of the friendship of the United States and that they may rely that the lands which they claim as their inheritance will be reserved for their sole use and benefit *until they may think it for their own advantage to dispose of the same.*" XXV *Jour. of the Cont. Cong.* 687 (emphasis added).

Plaintiffs respond that, although the instruction contemplated that the Six Nations might in the future desire to dispose of some of their land, this would be done only with Congress' concurrence. Defendants also note that the language of Article II of the Fort Stanwix Treaty stands in sharp contrast to the British Proclamation of 1763 and the 1783 Proclamation of Congress, each of which expressly forbade the purchase of lands from the Indians without the consent of the Crown and Congress, respectively. Moreover, they argue that state purchases of land from the Indians were contemplated by Congress' peace resolution which provided that "measures of Congress relative to Indian affairs, shall not be construed to affect the territorial claims of any of the states, or their legislative rights within their respective limits." XXV *Jour. of the Cont. Cong.* 693 (October 1783 session). The issue raised by these conflicting interpretations of the language of Article II of the Fort Stanwix Treaty is left for resolution by the district court upon remand, after an evidentiary hearing.

Regardless of the interpretation of Article II of the Fort Stanwix Treaty, there is the question of whether Congress' Proclamation of 1783 should be construed as prohibiting New York's 1785 and 1788 purchases from the Oneidas. That Proclamation, quoted above, prohibits

"all persons from making settlements on lands inhabited or claimed by Indians, *without the limits or jurisdiction of any particular State,* and from purchasing or receiving any gift or cession of such lands or claims without the express authority and directions of the United States in Congress assembled." (Emphasis added).

Although the Proclamation clearly forbids certain land purchases without congressional consent, questions are raised as to whether the Proclamation is authorized by Article IX, clause 4, and whether the underlined clause in the Proclamation is a geographical or jurisdictional restriction. This second question requires a determination whether the federal consent requirement is limited to lands outside of state boundaries or is limited to Indians living on tribal lands within or without a state, as distinguished from Indians who have become members of a state by reason of their abandonment of their tribe and assimilation into the society governed by a state.

Turning first to the second question, the Oneidas claim that the underlined phrase modifies "Indians," not "lands," relying upon the principle that a limiting clause refers to the "last antecedent" (here "Indians") when no contrary intention appears. *FTC v. Mandel Brothers Inc.,* 359 U.S. 385, 389, 79 S.Ct. 818, 822, 3 L.Ed.2d 893 (1959); 2A *Sutherland on Statutory Construction* § 47.33, at 159 (C. Sands ed. 1973). As evidence of an intention to refer to Indians who were "not members of any of the States" the Oneidas point to the use of that phrase in the Proclamation's preamble and argue that the term "limits" is synonymous with "jurisdiction" which immediately follows it. Restricting the Proclamation's applicability to Indians or Indian lands located outside state boundaries, they contend, would eviscerate Congress' intent to establish peace with Indians located within state boundaries, such as within New York, where over 90% of Oneidas and their tribal lands were located. Lastly they argue that the underlined clause, even if it modifies "lands," would not apply to *tribal* land within a state's border because the latter land is for some purposes "completely separated from that of the states." *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832).

Although the district court interpreted the clause as referring geographically to lands located outside of a state's borders, the issue appears inextricably linked to the meaning to be given to Article IX, clause 4,

which is quoted above. The key question is the interpretation to be given to the phrase "not members of any of the States" and to the proviso that the "legislative right of any State within its own limits" shall not be infringed or violated. We agree with the district court that the first phrase is facially ambiguous and that the proviso regarding state legislative rights makes the clause appear inconsistent on its face since the proviso could be interpreted as taking away what was granted to Congress only a few lines earlier, the "sole and exclusive right and power of . . . managing all affairs with the Indians." However, we do not agree that it can be disposed of summarily. We believe that a further effort should be made, by an evidentiary hearing, to resolve the facial ambiguity and inconsistency.

The legislative history of clause 4 does not mention extinguishment of Indian title. The reason may be that the states, as successors to the colonies, did not believe they had any more rights than the colonies had, i.e., the right to the underlying fee title, which gave them the right to extinguish Indian title only with the consent of the Crown. At the time of the Revolution neither the Crown nor Congress had consented to extinguishment by a colony or state.[19] While some of the history and contemporary interpretation of the key modifying phrases may indicate an intent to reserve to the states the power claimed by New York to purchase Indian tribal land within its boundaries (whether of fee or aboriginal title is unclear) there is also substantial evidence pointing in the opposite direction.

For instance, the argument that "Indians, not members of any of the States" refers to those located outside a state's geographical boundaries is met with evidence that since all Indians were in 1777, when the Articles were drafted, located within the borders of the states (it was only later beginning on March 1, 1781, that any states ceded part of their western lands to the federal government), a geographical interpretation would render the clause a meaningless nullity. Although, as Judge McCurn noted, in advocating adoption of the new Constitution Madison referred to clause 4 as "obscure and contradictory," he had in 1784, three years earlier, construed the phrase "not members of any of the States" as meaning Indians "who do not live within the body of the Society, or whose Persons or property form no objects of its laws" (i.e., those who left their tribe and were no longer subject to its laws). See Letter to James Monroe dated Nov. 27, 1784, I *Letters and Other Writings of James Madison* (G. Hunt ed. 1901).[20] See, in accord, *Oneida Indian Nation v. United States,* 37 Ind.Cl.Com. 522, aff'd, 576 F.2d 870 (Ct.Cl.1978). The term "person in [a] state" has been construed as excluding unassimilated Indians, *Elk v. Wilkins,* 112 U.S. 94, 100–02, 5 S.Ct. 41, 28 L.Ed. 643 (1884). Moreover, there is evidence that the drafters of clause 4 rejected proposed amendments lending themselves more readily to a geographical connotation, such as "not residing within the limits of any of the United States," IX *Jour. of the Cont. Cong.* 844, and "not within the bound-

19. It is significant that when New York ceded its western lands to Congress it authorized its delegates to do so only with respect to "the right of pre-emption of the soil," not the right to extinguish Indian title, from which it could be inferred that New York believed it had only the former right, not the latter. VII *Jour. of the Cont. Cong.* 34 (Folwell ed. 1800) (entry for March 1, 1781). Moreover, New York's reliance on *Clark v. Smith,* 38 U.S. (13 Pet.) 195, 10 L.Ed. 123 (1839), is misplaced. That case did not involve the right to extinguish Indian title, much less whether the right had been ceded to the United States.

20. In determining the weight to be given to Madison's Federalist No. 42, as compared with his interpretation three years earlier, one must appreciate that the Federalist was hardly a dispassionate, objective critique of the Articles. It represented, on the contrary, a studied effort, by finding as much fault with the Articles as was reasonably possible, to convince the states that the new Constitution should be ratified. The Federalist was not composed "in an atmosphere of calm disinterestedness" but "as an argument on one side of a bitterly controverted question. It was calculated to put the Constitution in the light which would make it most acceptable to the ratifying conventions." J. tenBroek, "Use by the United States Supreme Court of Extrinsic Aids in Constitutional Construction," 27 Calif.L.Rev. 157, 163 (1939).

aries of any Colony," VI *Jour. of the Cont. Cong.* 1076. That Congress, through its Indian commissioner, did not act more aggressively when it acquiesced in Pennsylvania's purchase of some Indian land and requested, rather than ordered, New York to cooperate in the negotiation of the Fort Stanwix Treaty, are slender reeds upon which to structure an interpretation of clause 4.[21]

As the district court recognized, there are surrounding circumstances from which it could be inferred that the clause 4 proviso against infringement or violation of the "legislative right of any State within its own limits" had nothing to do with a state's right to extinguish Indian title but was aimed at preventing Congress and the so-called "landless" states (e.g., Pennsylvania, Rhode Island, and Delaware) from defining the western borders of the "landed" states (e.g., New York and Virginia) which claimed borders extending indefinitely westward (some said to the "South Seas"). It was not until some years later that the "landed" states (due partly to refusal by Maryland to vote for the Articles) limited their western borders by ceding lands to the new Confederacy. There is also evidence to the effect that the proviso regarding state legislative rights was viewed by contemporaries not as authorizing the state to extinguish title to Indian land within their borders, which would nullify the express grant (earlier in the same clause) to Congress of "the sole and exclusive right and power . . . of regulating the trade and managing all affairs with the Indians," but as reserving to the states their right as sovereigns to the underlying fee title. See 1 *Letters and Other Writings of James Madison* 92 (G. Hunt ed. 1901). This interpretation would be consistent with a requirement that the states obtain Congress' consent before extinguishing the Indians' right of occupancy, which was not done by New York with

respect to its 1785 and 1788 "treaties" with the Oneidas. As Jefferson later wrote in 1791, "neither under the present constitution, nor the ancient confederation, had any State or person a right to treat with the Indians, without the consent of the General Government," VIII *Writings of Thomas Jefferson* 225–26 (A. Bergh ed. 1905); see also *id.* at 99–101 (1790 letter to same effect).

In sum we do not view the foregoing claims as lending themselves to summary disposition on a motion to dismiss. A more thorough analysis of all relevant evidence offered by the parties is required.

*Claim That the New York Treaties With the Oneidas Gave Rise to a Trust Protected by the Nonintercourse Act or Constituted a Lease*

The problems arising from plaintiffs' claims based on the Articles of Confederation might be avoided to the extent that they could state a claim based upon violation of the Nonintercourse Act of 1790, 1 Stat. 137, 25 U.S.C. § 177,[22] which was enacted after the Constitution was adopted. The validity of any such claim, however, would depend in part on their being able to show that they retained a post-Constitution land interest which was taken from them by New York in violation of their rights under that Act. Toward that purpose plaintiffs have added claims to the effect that New York's fraud in inducing them to enter into the Treaties of 1785 and 1788 with it gave rise to a constructive trust in their favor as beneficiaries of the land, which the defendants have refused to turn over to them in violation of the Nonintercourse Act, and that the provisions under which they retained hunting and fishing rights and reserved rent in perpetuity amounted to a perpetual lease that was wrongfully cancelled in violation of the Act

---

**21.** Congress' alleged lack of enforcement powers under the Articles is not relevant to the question of whether the State of New York had delegated to Congress the authority to preclude that state from extinguishing Indian title without federal consent.

**22.** "No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177.

by New York in 1839 when it capitalized future rentals into one lump sum payment.

■ We affirm the district court's dismissal of these claims as insufficient on their face, substantially for some of the reasons stated by Judge McCurn in his July 23, 1981 opinion. The language of the treaties clearly amounts to a sale, not a trust, and plaintiffs fail to allege any facts from which it could reasonably be inferred that the parties intended it to create a trust agreement. Moreover, a "constructive" trust constitutes more of a remedy than a legal relationship. In any event, assuming *arguendo* that New York was entitled without federal consent to purchase the Oneidas' land, judicial inquiry into the "manner, method and time" of its extinguishment of Indian title would be barred. *United States v. Santa Fe Pacific Ry. Co.,* 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941).

■ The claim that the New York treaties gave rise to a lease under which the Oneidas retained an interest in the land as lessors also fails. Even if the terms "cede and grant all their lands" were so construed they would amount to a perpetual lease under which the lessee had the right to possession and the Oneidas reserved only the right to rent with no reversionary interest or right of re-entry. See *Van Rensselaer v. Hays,* 19 N.Y. 68 (1859). The Oneidas confirmed this, expressing the view that the rent "was to increase with the increase of the Settlements on our lands until the whole Country was settled, and then to remain a standing Rent forever." F. Hough, *Proceedings of the Commissioners of Indian Affairs,* 360 (Albany 1861). As the country was settled the Oneidas' hunting and fishing rights would diminish, leaving them with a claim for rent, not repossession of land.

### The Defense Based on the Treaty of Canandaigua

Assuming that upon remand the district court should decide that the New York treaties here under attack violate the Articles, the Proclamation of 1783, or the 1784 Treaty of Fort Stanwix, or all of them, there would remain for consideration a defense not reached by it, that under the Treaty of Canandaigua, 7 Stat. 44, entered into between the United States and the tribes of the Six Nations (including the Oneidas) on November 11, 1794, after the Constitution and first and second Indian Trade and Intercourse Acts, 1 Stat. 137 (1790) and 1 Stat. 329 (1793), had been adopted, the Oneida Indian Nation relinquished any right to the lands now claimed by it and ratified its 1785 and 1788 treaties with New York. Since this defense was not addressed below we find no reason to express any views with respect to it at this time except to note that here again serious questions of construction are raised, which probably could not be resolved without an evidentiary hearing.

Under Art. II of the treaty the "United States acknowledges the lands reserved to the Oneida, Onondaga and Cayuga nations, in their respective treaties with the State of New York . . ." and under Art. IV the "Six Nations, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States. . . ." Defendants argue that the treaty represents a retroactive ratification of New York's purchases of Oneida land under the 1785 and 1788 state treaties and an acknowledgement by the Oneidas that they will not claim lands other than those reserved to them under the New York treaties. The Oneidas, on the other hand, relying on *United States v. Santa Fe Pacific Ry. Co.,* 314 U.S. 339, 356–57, 62 S.Ct. 248, 256, 86 L.Ed. 260 (1941), contend that the United States' recognition that certain lands were reserved to them leaves undisturbed their claims to their aboriginal land located elsewhere and not so reserved (which would include the land that was the subject of the 1785 and 1788 treaties), and that in any event the Treaty of Canandaigua, which was the last in a series aimed at obtaining Indian cession of Ohio Valley lands to the United States, applies only to the territory that had been in dispute, namely, Ohio territorial lands outside the

boundaries of the states, not Oneida land in New York. Resolution of these issues would require an examination of all relevant evidence. For example, at argument plaintiffs' counsel referred to certain Quaker logs they wished to introduce bearing on the interpretation of the language of the Treaty of Canandaigua.

## CONCLUSION

We affirm the district court's dismissal of all claims except those based on the Articles of Confederation, the Proclamation of 1783 and the 1784 Treaty of Fort Stanwix, dismissal of which is reversed and the claims remanded to the district court for further proceedings in accordance with our opinion.

We also affirm the district court's dismissal of defenses based on non-justiciability, Eleventh Amendment sovereign immunity, and time-bars or laches. The defense based on the 1794 Treaty of Canandaigua remains for such adjudication as may be necessary after resolution of plaintiffs' remanded claims. Each party will bear its own costs incurred for this appeal.

